DECISION
Joshua Adams appeals from a September 22, 2009 decision of a Superior Court Magistrate affirming the classification order issued by the Sex Offender Board of Review. The Sex Offender Board of Review and the Magistrate found that Mr. Adams should be classified as a Level III sex offender, for purposes of G.L. 1956 § 11-37.1.
 Travel
On January 10, 2008, the State instituted Superior Court proceedings to "affirm the finding of the Sex Offender Board of Review" (December 26, 2007 Record of the Sex-Offender Board of Review and Motion to Affirm Proceedings). Mr. Adams objected.[1]
The matter came on for hearing before a Magistrate of the Court who concluded "the decision of the Board . . . is affirmed. Petitioner shall be classified as a Level III. Community notification shall be made accordingly . . ." (Tr. of July 21, 2009, p. 13.) A motion for stay of the Magistrate's orders was granted temporarily. Counsel then scheduled the case for hearing before a Justice and briefed the appeal. *Page 2 
 Standard of Review
G.L. 1956 § 8-2-39.2 sets forth the parameters of this Court's review of a Magistrate's Order:
 "8-2-39.2. Drug Court Magistrates — Appointment, duties and powers. — (a) * * *
 (f) A party aggrieved by an order entered by the Drug Court Magistrate shall be entitled to a review of the order by a justice of the Superior Court. Unless otherwise provided in the rules of procedure of the court, such review shall be on the record and appellate in nature. The Superior Court shall, by rules of procedure, establish procedures for reviews of orders entered by a Drug Court Magistrate, and for enforcement of contempt adjudications of a Drug Court Magistrate."
Upon review, "a Justice of the Superior Court is required only to give a de novo review of the Magistrate's decision, based on the record." State v. Dubois, P.M. No. 07-1611 (Superior Court, 2009, p. 4.) This review of a Magistrate's decision is limited in scope, by the language of the statute.
To review an order of a Magistrate, this Court must consider the procedure that the Magistrate must employ in reviewing the findings of the Sex Offender Board of Review. When the Superior Court initially conducts a review of a classification by the Sex Offender Board of Review, the State has the initial "burden of going forward, which burden shall be satisfied by presentation of a prima facie case that justifies the proposed level of and manner of notification." Section 11-37.1-16(a). The term "prima facie case" in this context has been statutorily defined as meaning that "(l) [a] validated risk assessment tool has been used to determine the risk of re-offense; [and] (2) reasonable means have been used to collect the information used in the validated risk assessment tool." Section 11-37.1-16(b), as amended by P.L. 2003, Ch. 162 § 1. State v. Germane,971 A.2d, 555, 570, fn. 24. *Page 3 
 Analysis
It is important to note, upfront, that the Magistrate provided a thoughtful, comprehensive analysis, detailed in the transcript of the proceedings before him on July 2l, 2009. On pages 2 through 13 he discussed the burden of proof, the evidence before him, and made findings of fact regarding Mr. Adams' home setting. The Magistrate reviewed the reports of the consultants and the conclusions of the Board to reach a well-reasoned conclusion. For example, after having reviewed the analyses and diagnostic assessments, the Magistrate expressed his concern for Mr. Adams' extended period without treatment. (Tr. July 21, 2009, p. 8.)
Mr. Adams, via this challenge to the Magistrate's ruling, doesnot contend that the Magistrate erred in applying the law. No cases are cited in his memoranda. Mr. Adams does not question whether the Magistrate applied an incorrect standard of review. Mr. Adams only dispute is whether the Magistrate's (and the Sex Offender Board of Review's) factual conclusions, were based on the evidence as presented.
The record of the Sex Offender Board of Review contains a variety of information including the J-SOAP[2] clinical assessment tool, a report made by Mr. Myles Glatter, a licensed social worker, various police reports and statements, and a Department of Children, Youth Families (DCYF) progress report. Mr. Adams attempted to supplement the record with a supplemental report from Mr. Glatter and correspondence from the mother of one of his victims. This Justice refused to re-open the record, given the limited nature of the proceedings on appeal. Re-opening the record now, with documents which were not presented to the Sex Offender Board of Review and may not *Page 4 
have been presented to the Magistrate, would provide Mr. Adams with a third bite at the fact-finding apple. The case is now before the Court on an appeal of the Magistrate's Order. This review is on the record only. G.L. 1956 § 8-2-11.1(d). Before the Magistrate was the limited issue of whether the decision of the Sex Offender Board of Review was appropriate and should be confirmed.
Mr. Adams contends that his life style was stable, and questions the Magistrate's conclusion that his life was unstable. Mr. Adams relies upon a letter submitted by a victim's mother (Mr. Adams' sister) to establish that the family unit is a cohesive family group. The letter was written on January 15, 2008 and is not included in the Board's record, as certified to this Court in January 2008. The Glatter report of April, 2005 describes Mr. Adams as living in a group home, unemployed at age l9, and trying to move to independent living. The DCYF progress report of December 2005 describes how Mr. Adams moved into his own apartment in Providence in October of 2005, was severely beaten while working at a gas station, and then moved into a house that his mother owned. (DCYF Juvenile Probation Progress Report, 11-5-03). Essentially, after having been convicted, he was living alone, out of school and unemployed in Carolina, R. I. Although the Probation Report stated his mother lived with him occasionally, the November l8, 2005 sex offender registration form of Mr. Adams lists his sister (the mother of the victim) as the next of kin. Clearly, the Magistrate was appropriate in concluding that Mr. Adams' life was unstable based on the record as presented.
Mr. Adams then questions the significance of the Magistrate's conclusion that Mr. Adams is not presently in counseling. Mr. Adams completed seven years of counseling, including residential care. Claiming that "he should not be penalized for successfully *Page 5 
completing his programs" (Adams' November 18, 2009 Memorandum at p. 6.) misses the mark. The statute and the classification system consider the risk of re-offense to determine the appropriate treatment level. "The regulations shall provided for three (3) levels of notification depending upon the risk of re-offense level of the sex offender . . ." Section 11-37.1-12.
Mr. Adams also criticizes the Magistrate's conclusion, drawn on Mr. Glatter's 2008 supplemental report. Again, the 2008 report was not submitted as a part of the record from the Sex Offender Board of Review which reached its final decision in June of 2006. The only references to the 2008 Glatter report are on pps. 6 and l2 of the Magistrate's decision (See Magistrate's Tr. of July 8, 2008) wherein the Magistrate notes the inconsistencies of the 2008 and 2005 reports. On page 10 of the 2005 Glatter report, Mr. Glatter stated:
 ". . . With continued support and reinforcement in treatment to help ensure that he follows through with what he has learned over the past several years, it is my hope that Joshua will be able to make good decisions in real life situations as well.
 Both Mary Brilsford, LICSW and Robert Johnson, LISCW have serious reservations and concerns about Joshua moving into an independent living situation and him having less counseling time and more freedom. Given the number of victims he has had, his resistance at times to completing assignments, and reluctance to being open and honest in sharing information with his therapists regarding high-risk situations he has faced, I share these concerns.
 * * * Thus, I believe that the better choice for Joshua, though not ideal, is to have him move out of his Turning the Corner group home and into an independent living program at Communities for People and have him practice living in the "real world," while he has the support and supervision of his probation officer, independent living program staff, and his group and individual therapists." *Page 6 
This Court recognizes that the 2005 report was prepared just before Mr. Adams was to turn age 21. While he may not have been required to continue counseling as a condition of his sentence, Mr. Glatter never provided a sufficient explanation for suspending all counseling and treatment.[3] Indeed, the 2008 report, never presented to the Sex Offender Board of Review, is significantly different:
 ". . . Mr. Adams was in residential and outpatient treatment for six or seven years of his life. He lived in several different residential programs . . . When he turned twenty-one, he was done with the required treatment and done with probation. It is not surprising that Mr. Adams wanted to move on with his life, and no longer be involved in counseling at that point in his life." (Glatter report, 2008 p. 11.)
Mr. Glatter never reconciled the vast difference in his two reports, or his new conclusions.[4] Apparently treatment and counseling is not suggested by Mr. Glatter simply because Mr. Adams was not known to have re-offended, and does not desire to participate in on-going counseling. While Mr. Adams may choose to avoid counseling, the task of the Sex Offender Board of Review is to determine his risk to society. The Board and the Magistrate thoroughly and appropriately reviewed the counseling participation records and the social workers reports.
Another factor dissuades this Court from finding that Mr. Adams has met his burden. While Mr. Adams was within the moderate risk levels by one methodology, the risk was still substantial. In 2003, Mr. Glatter used a risk assessment scale taken from the New Jersey Attorney General's guidelines for sex offender registration and community notification. It was Mr. Glatter who selected this scale. Mr. Glatter reported: *Page 7 
 "On this risk scale, Joshua received a score of 71 which places him in the moderate range of re-offending (Low range of risk = 0 to 36; moderate risk = 37 to 73; high risk = 74 to 111). Though Joshua's scores are significantly higher than some of the clients whom I have evaluated in recent years, in my professional opinion he does not fall within the category of high risk of re-offending." (2005 Glatter report, pp. 9-10.)
While Mr. Adams was considered a moderate risk by this scale, he was a mere three points away from being in a high risk category.
Mr. Adams objection contains a common theme — based on the statistical tools his risk to re-offend is not among the highest. Unfortunately, the task of the Sex Offender Board of Review cannot be accomplished simply by procuring the results of standardized examinations. The task is not one of a simple mathematical computation. The Board is called upon to consider Mr. Adams' life in its entirety, including his surroundings, home environment, ongoing treatment, and counseling, and all else that sheds light upon his risk to re-offend. As our Supreme Court noted:
 "We first note that any prediction of future risk is an inherently difficult and perhaps an imperfect undertaking. Risk assessment is not an exact science, and a certain amount of judgment and even intuition must be exercised by both the Board of Review and the reviewing magistrate." State vs. Germane, 971 A.2d 555, 589 (R.I. 2009).
The task of the Board is daunting but critical to ensure the protection of future victims from heinous crimes. In Mr. Adams' case, potential victims could include young children.[5]
Sections 11-37.1-11, 12 and 13 establishes the authority of the Sex Offender Board of Review to classify sex offenders, based upon the risk that the individual will re-offend. *Page 8 
The Board properly followed the procedures, and the Defendant never alleges that the Board failed to follow the requirements of either the statute, or the regulations acted pursuant to the statute. This Court is convinced that the Sex Offender Board of Review, armed with all of the information appropriately before it, acted appropriately, as did the Magistrate.
The State met its initial burden of proof by establishing a prima facie case before the Magistrate. When the burden then shifted to Appellant to rebut the Board's classification of his risk, he failed to do so by even a mere preponderance of the evidence. SeeState v. Germane, 971 A.2 555, 580 (R.I. 2009). The Magistrate independently weighed and evaluated the evidence. He conducted the appropriate analysis, did not overlook or misconceive material evidence, and was not otherwise clearly wrong.
 Conclusion
For the reasons set forth, the Decision of the Magistrate is affirmed, and the Appeal is dismissed.
[1] Oddly, the docket does not reflect a challenge by Mr. Adams to the Board's decision. Instead, the State moved to affirm the Board's decision, a process established in part by § 11-37.1-6(c)(2)(II). Mr. Adams did not move to vacate. Just as curious, the docket shows no appeal of the decision of the Magistrate. While the statute allows for review of a Magistrate's order, future litigants should strictly comply with Superior Court Administrative Order 94-12 by filing a notice of appeal.
[2] A J-SOAP is the Juvenile Sex Offender Assessment Protocol. It is an adolescent risk assessment tool, commonly used when Mr. Adams was evaluated in June, 2006.
[3] The Court finds no reference to treatment other than counseling, in the section of Mr. Glatter's 2008 report entitled "V SEXUAL HISTORY, SEXUAL ABUSE ALLEGATIONS, and TREATMENT ISSUES."
[4] While not accepted, the supplemental report of Mr. Glatter of 2008 appears to be designed to refute the conclusions of the Sex Offender Board of Review.
[5] "Sex offenders are a serious threat in this Nation."McKune v. Lile,536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47
(2002) (plurality opinion). "[T]he victims of sex assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault." Id., at 32-33, 122 S.Ct. 2017.